ESTATE OF JOSEPH GAMA ETC., ET. AL.
v.
COUNTY OF LOS ANGELES, ET. AL

USDC CASE NO. 17-5734-JFW(ASx)

OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT/SUMMARY
ADJUDICATION; REQUEST FOR JUDICIAL NOTICE

EXHIBIT 6- JOINT SETTLEMENT AGREEMENT
REGARDING THE LOS ANGELES COUNTY JAILS;
AND STIPULATED ORDER OF RESOLUTION;
UNITED STATES OF AMERICA V COUNTY OF LOS
ANGELE, ET. AL.; UNITED STATES DISTRICT
COURT FOR THE CENTRAL DISTRICT OF
CALIFORNIA, CASE NO. 2:15-CV-05903-DDP-JEM
FILED 9/3/2015

JS-6

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CV No. 15-05903 DDP (JEMx) |
| Plaintiff, | **JOINT SETTLEMENT AGREEMENT REGARDING THE LOS ANGELES COUNTY JAILS; AND STIPULATED ORDER OF RESOLUTION** |
| v. | |
| COUNTY OF LOS ANGELES AND LOS ANGELES COUNTY SHERIFF JIM MCDONNELL, in his Official Capacity, | |
| Defendants. | |

## I.     INTRODUCTION

1.     The United States of America, acting through the United States Department of Justice ("United States"), the County of Los Angeles ("County") and Sheriff Jim McDonnell, in his official capacity ("Sheriff"), (collectively, the "Parties") share a mutual interest in treating all members of the community with respect, promoting safe and effective custodial care, protecting public safety, and upholding the constitutional rights of prisoners.[1]

---

[1]     "Prisoners" is a defined term in Section III of this Agreement and includes pre-trial detainees and individuals convicted of a criminal offense.

1

1    2.    The Los Angeles County Jails ("Jails") are an integral part of the

2  public safety system in Los Angeles County, California.  Together, the Jails form

3  the largest jail system in the nation and house among the highest populations of

4  prisoners with mental illness.  Maintaining these facilities is an immensely

5  complex enterprise -- approximately 15,500 to 19,500 prisoners are held in custody

6  daily, spread across multiple custody facilities, numerous patrol stations, and over

7  29 courthouses.  These facilities' primary function is to incarcerate individuals

8  accused or convicted of committing a crime.  In doing so, these facilities provide

9  food, shelter, and clothing, but must also address the serious medical and mental

10  health needs of the prisoners and ensure their reasonable safety.

11    3.    The United States acknowledges that the County and the Sheriff have

12  demonstrated a renewed commitment to reforming the Jails and have begun to

13  implement improved policies and practices designed to enhance the treatment and

14  care of prisoners with mental illness.  The County and the Sheriff are also

15  exploring strategies to safely divert individuals with mental illness from the

16  criminal justice system, whenever possible.  The United States further

17  acknowledges that the number of suicides at the Jails decreased in 2014 from the

18  previous year.  In addition, the County and the Sheriff have made significant

19  commitments to protect prisoners from abuse and excessive force by staff that

20  further the Parties' mutual interest.  Finally, the United States acknowledges that

21  some of the needed changes the County and the Sheriff seek to implement through

22  this Agreement will require the allocation of additional resources to the Sheriff's

23  Department and the Los Angeles County Department of Mental Health ("DMH").

24    4.    Accordingly, this Joint Settlement Agreement Regarding the Los

25  Angeles County Jails ("Agreement") is intended to build upon measures that are

26  underway and to sustain systemic improvements that are designed to protect

27

28

1 prisoners from conditions in custody that place them at unreasonable risk of harm
2 from suicide, self-injurious behavior, or unlawful injury by others, in accordance
3 with their constitutional rights.  This Agreement also is expected to have collateral
4 benefits that promote public safety, improve confidence in the County's criminal
5 justice system, and support the County's and the Sheriff's collaborative efforts to
6 expand comprehensive and effective mental health diversion and re-entry programs
7 that are designed to lead to more positive outcomes in the care and custody of
8 individuals with serious mental illness who are also participants in the criminal
9 justice system.

<strong>II.    BACKGROUND</strong>

11      5.    The County owns and funds the operations of the Jails.  The Sheriff's
12 Department is responsible for providing care, custody, and control of prisoners at
13 the Jails.  The Sheriff's Department Medical Services Bureau provides medical
14 care within the Jails.  DMH is responsible for providing mental health care in the
15 Jails through its Jail Mental Health Services program.

16      6.    The Sheriff is an elected official who is responsible for operating and
17 exercising authority over the Jails.

18      7.    In June 1996, the Department of Justice notified the County and
19 Sheriff that it was opening an investigation under the Civil Rights of
20 Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997, to determine whether
21 the conditions in the Jails violate the constitutional rights of its prisoners.

22      8.    In September 1997, the Department of Justice issued a findings letter
23 alleging that mental health care at the Jails violated prisoners' constitutional rights.
24 The letter further alleged that systemic deficiencies contributed to the violations,
25 including inadequate:  (1) intake screening and evaluation; (2) diagnosis; (3)
26 referral to mental health professionals; (4) treatment plans; (5) administration of
27 medications; (6) suicide prevention; (7) tracking and medical record keeping;
28 (8) staffing; (9) communication; and (10) quality assurance.

3

1      9.     In December 2002, following extensive negotiations and additional

2 site visits, the Parties entered into a Memorandum of Agreement (MOA) that

3 outlined a series of reforms to ensure that adequate and reasonable mental health

4 care services are provided at the Jails. The MOA also included measures to protect

5 prisoners with mental illness from abuse and mistreatment.

6      10.    Under the MOA, the County and the Sheriff have made significant

7 improvements to the delivery of mental health care at the Jails, including

8 implementing electronic medical records, increasing mental health staffing, and

9 developing roving evaluation teams composed of mental health professionals and

10 specially-trained custody staff.  Despite considerable progress, the United States

11 alleges that systemic deficiencies remain related to suicide prevention and mental

12 health care that violate prisoners' constitutional rights.  The Department of Justice

13 notified the County and the Sheriff of these allegations in a letter dated June 4,

14 2014, following on-site evaluations with expert consultants.

15      11.    In September 2013, the Department of Justice opened a separate

16 investigation of the Jails under CRIPA and 42 U.S.C. § 14141 ("Section 14141")

17 to address allegations of use of excessive force against all prisoners at the Jails, not

18 just prisoners with mental illness.  During the course of the investigation, the

19 County and the Sheriff entered into a comprehensive settlement agreement to

20 resolve *Rosas v. McDonnell*, Case No. CV 12-0428-DDP (C.D. Ca. filed on Jan.

21 18, 2012) (hereinafter "*Rosas*"), a class action lawsuit alleging abuse and excessive

22 force by staff at certain Jails located in downtown Los Angeles.  As part of the

23 *Rosas* settlement agreement, the County and the Sheriff have agreed to implement

24 significant measures to protect prisoners from excessive force by staff, including

25 improvements in policies, training, incident tracking and reporting, investigations,

26 resolution of prisoner grievances, prisoner and staff supervision, and

27 accountability.

28

4

1    12.   This Agreement addresses remaining allegations concerning suicide
2  prevention and mental health care at the Jails resulting from the partial
3  implementation of the 2002 MOA and current conditions within the Jails.  This
4  Agreement also extends the remedial measures in the Implementation Plan of the
5  *Rosas* settlement agreement to fully resolve the Department of Justice's CRIPA
6  findings regarding alleged mistreatment of prisoners with mental illness and claims
7  under Section 14141 regarding alleged excessive force against prisoners at all of
8  the Jails.
9    13.   As indicated in Section VII of this Agreement, the Parties consent to a
10  finding that this Agreement complies in all respects with the provisions of the
11  Prison Litigation Reform Act, 18 U.S.C. § 3626(a).
12    14.   Except to enforce, modify, or terminate this Agreement, this
13  Agreement, and any findings made to effectuate this Agreement, will not be
14  admissible against either the County or the Sheriff in any court for any purpose.
15  Moreover, this Agreement is not an admission of any liability on the part of the
16  County or the Sheriff, and/or either of its employees, agents, and former employees
17  and agents, or any other persons, and will not constitute evidence of any pattern or
18  practice of wrongdoing.
19              **III.   DEFINITIONS**
20    15.   The following definitions will apply to terms in this Agreement:
21    (a)   "Sheriff's Department" refers to the Los Angeles County Sheriff's
22           Department, which is responsible for all custody, corrections, and
23           security functions within the Los Angeles County Jails system,
24           including the provision of medical care to prisoners through the
25           Sheriff's Department Medical Services Bureau.
26    (b)   "Jails" refers to the Los Angeles County Jails system, and shall
27           include Men's Central Jail ("MCJ"), Twin Towers Correctional
28           Facility ("TTCF"), Inmate Reception Center ("IRC"), Century

5

Case 2:15-cv-05903-DDP-JEM   Document #:144 Filed 09/03/15   Page 7 of 57   Page ID #:106

1    Regional Detention Facility ("CRDF"), North County Correctional

2    Facility ("NCCF"), Pitchess Detention Center ("PDC"), and other

3    facilities in which prisoners are detained or held in custody by the

4    County and the Sheriff, including lockup facilities and courthouse

5    holding areas as well as any visiting area in the facility, and any

6    facility that is built, leased, or otherwise used, to replace or

7    supplement the current Jails or any part of the Jails.

8    (c)    "United States" or "DOJ" refers to the United States Department of

9    Justice, specifically the Special Litigation Section of the Civil Rights

10    Division and the United States Attorney's Office for the Central

11    District of California, which represent the United States in this matter.

12    (d)    "The County" refers to the County of Los Angeles, the Los Angeles

13    County Sheriff's Department, the Los Angeles County Department of

14    Mental Health, and the agents and employees of the Sheriff's

15    Department and the Department of Mental Health.  The Department

16    of Mental Health ("DMH") includes any successor County department

17    that assumes the duties and responsibilities of DMH.

18    (e)    "Sheriff" refers to the Los Angeles County Sheriff, currently Jim

19    McDonnell, an independently-elected constitutional officer, in his

20    official capacity, and any predecessors or successors in office,

21    including any designated acting or interim Sheriff.

22    (f)    "Custody staff" means sworn deputy sheriffs and custody assistants.

23    (g)    "Days" are measured in calendar days; weekend days and County

24    holidays are included.

25    (h)    "Normal business work days" means all days except for weekend days

26    and County holidays.

27    (i)    "Describe" means provide a clear and detailed description of

28    something done, experienced, seen, or heard.

6

1  (j) "Document" when used in this Agreement as a verb means

2     completing a record of information either in hard copy or in electronic

3     format.

4  (k) "Effective Date" means the date the Court enters the signed

5     Agreement as an order of the Court, or July 1, 2015, whichever is

6     earlier.

7  (l) "Emergency maintenance needs" means a need that if left unattended

8     could result in imminent danger to the life, safety, or health of

9     prisoners.

10  (m) An "emergent" or "urgent" mental health need, as used in this

11     Agreement, is one which the Arrestee Medical Screening Form (SH-

12     R-422) or its equivalent and/or the Medical/Mental Health Screening

13     Questionnaire indicate that immediate action is required to preserve

14     life, prevent serious bodily harm, or relieve significant suffering.

15  (n) "Good cause" means fair and honest reasons, regulated by good faith

16     on the part of either party, that are not arbitrary, capricious, trivial, or

17     pretextual.

18  (o) "Implement" or "implementation" means putting a remedial measure

19     into effect, including informing, instructing, or training impacted

20     personnel as required by this Agreement, and ensuring that policies or

21     procedures are in fact followed.

22  (p) "Include," "includes," or "including" means "include, but not be

23     limited to" or "including, but not limited to."

24  (q) "Jail Reception Centers" mean all Sheriff's Department processing

25     facilities that handle incoming bookings and arrests and that are

26     responsible for medical and mental health screenings and

27     classification, including the Inmate Reception Center and the Century

28

1    Regional Detention Facility.  This does not include Sheriff's
2    Department station jails.
3    (r)    "Mental Health Housing" refers to prisoner housing areas in the Jails
4         that include only the Forensic In-Patient (FIP), High Observation
5         Housing (HOH), and Moderate Observation Housing (MOH) areas.
6         (i)    "Correctional Treatment Center" or "CTC" refers to the
7             licensed health facility with a specified number of beds within
8             the Jails designated to provide health care to that portion of the
9             prisoner population that does not require a general acute care
10            level of services, but which is in need of professionally
11            supervised health care beyond that normally provided in the
12            community on an outpatient basis.
13        (ii)   "Forensic In-Patient" or "FIP" can be used interchangeably
14            with Mental Health Unit of the Correctional Treatment Center
15            (MHU CTC).  The FIP is located in the CTC and houses
16            prisoners who present an acute danger to self or others or are
17            gravely disabled due to a mental illness and require inpatient
18            care.
19        (iii)  "High Observation Housing" or "HOH" refers to designated
20            areas for prisoners with mental illness who require an intensive
21            level of observation and care and/or safety precautions.
22        (iv)   "Moderate Observation Housing" or "MOH" refers to
23            designated areas for prisoners with a broad range of mental
24            health diagnoses and functioning whose mental health needs
25            can be cared for in a less intensive and more open setting than
26            the HOH areas, but preclude general population housing.
27
28

8

(s)    "Monitor" or "Independent Monitor" means the individual selected by the Parties whose duties, responsibilities, and authority are set forth in Section VI of this Agreement.

(t)    "Subject Matter Experts" or "SMEs" means the individuals selected by the Parties whose duties, responsibilities, and authority are set forth in Section VI of this Agreement.

(u)    "Prisoners" or "Prisoner" is construed broadly to refer to one or more individuals detained at, or otherwise housed, held, in the custody of, or confined at the Jails based on arrests, detainers, criminal charges, civil contempt charges, or convictions.

(v)    "Psychotropic medication" means any substance used to treat mental health problems or mental illness and is capable of modifying mental activity or behavior.

(w)    "Qualified Medical Staff" refers to physicians, physician assistants, nurse practitioners, registered nurses, certified nursing assistants, and licensed vocational nurses, each of whom is permitted by law to evaluate and care for the medical needs of patients.

(x)    "Qualified Mental Health Professional" or "QMHP" refers to psychiatrists, psychologists, psychiatric social workers, psychiatric nurses, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for the mental health needs of patients.

(y)    "Clinical Restraints" is any device that limits a person's ability to move freely and has been ordered or approved by a licensed psychiatrist for the purpose of managing behavior that appears to be symptomatic of a mental illness.

9

(z)   "Security Restraints" is any device that limits a person's ability to move freely and has not been ordered by a licensed psychiatrist or Qualified Medical Staff.

(aa)  "Serious mental illness" includes psychotic disorders, major mood disorders (including major depression and bipolar disorders), and any other condition (excluding personality disorders, substance abuse and dependence disorders, dementia, and developmental disability) that is associated with serious or recurrent significant self-harm, suicidal ideation, imminent danger to others, current grave disability, or substantially impaired ability to understand routine instructions, or that prevents access to available programs.  Although personality disorders alone generally do not qualify as serious mental illness, personality disorders associated with serious or recurrent significant self-harm do qualify as serious mental illnesses.

(bb)  "Suicide attempt" means any serious effort to commit an act of self-harm that can result in death and involving definite risk.

(cc)  "Serious suicide attempt" means a suicide attempt that resulted in or could have resulted in significant and life-threatening injury.

(dd)  "Suicide Precautions" means any level of watch, observation, or measures specifically intended to prevent suicide or self-harm and includes both Suicide Watch and Risk Precautions as defined in this Agreement.

(ee)  "Suicide Watch" means the level of watch, observation, or measures intended to identify and safely maintain prisoners who are imminently suicidal and require admission to the Mental Health Unit of the Correctional Treatment Center (MHU CTC or FIP) on a 72-hour hold, in accordance with California Welfare and Institutions Code Section 5150.

10

(ff) "Risk Precautions" means a level of watch, observation, or measures used to identify and safely maintain those prisoners who require heightened observation and daily re-evaluation, and require admission to HOH but are not considered to pose an imminent risk of suicide.

(gg) "Suicide resistant location" means a housing assignment in which known or apparent suicide hazards do not exist or have been removed.

(hh) "Self-injurious behavior" means any behavior that is self-directed and deliberately results in injury or the potential for injury to oneself and there is no evidence of suicidal intent.

(ii) "Serious self-injurious behavior" means self-injurious behavior where the injury is significant enough that it could lead to loss of life or limb or have serious medical complications.

(jj) "Direct constant observation" means continuous uninterrupted observation of a prisoner within a proximity that ensures the observer can both see and hear the prisoner to assure the prisoner's well-being, absent extraordinary circumstances.

(kk) "Unobstructed visual observation" means continuous but not necessarily uninterrupted observation within a reasonable physical distance of the prisoner(s).

(ll) "Train" means to instruct in skills to a level that the trainee has the demonstrated proficiency, through an assessment or evaluation, to implement those skills as and when called for. "Trained" means proficient in the skills.

(mm) Throughout this Agreement, the following terms are used when discussing compliance: substantial compliance, partial compliance, and non-compliance. "Substantial Compliance" means that the County and the Sheriff have achieved compliance with the material components of the relevant provision of this Agreement in accordance

11

1    with the Monitor and SMEs' monitoring plan and compliance
2    measures. "Partial Compliance" means that the County and the
3    Sheriff have achieved compliance on some, but not all, of the material
4    components of the relevant provision of this Agreement. "Non-
5    compliance" means that the County and the Sheriff have not met most
6    or all of the material components of the relevant provision of this
7    Agreement. Non-compliance with mere technicalities, or temporary
8    failure to comply coupled with prompt and appropriate corrective
9    action during a period of otherwise sustained compliance, will not
10   constitute failure to maintain Substantial Compliance. At the same
11   time, temporary compliance during a period of otherwise sustained
12   Non-compliance will not constitute Substantial Compliance.

13   (nn)   "Policy" or "Policies" mean regulations, directives, or manuals,
14   regardless of name, that have been approved by a senior executive
15   within the Sheriff's Department ("LASD") or DMH and that describe
16   the duties, functions, or obligations of LASD or DMH staff and
17   provide specific direction in how to fulfill those duties, functions, or
18   obligations. References to "existing" policies mean those policies in
19   effect on the Effective Date of this Agreement, and include any
20   subsequent revisions or changes made to those policies after the
21   Effective Date of this Agreement.

22            **IV.   OVERALL OBJECTIVES AND GOALS**

23   16.   Consistent with constitutional standards, the County and the Sheriff
24   will provide prisoners at the Jails with safe and secure conditions and ensure their
25   reasonable safety from harm, including serious risk from self-harm and excessive
26   force, and ensure adequate treatment for their serious mental health needs. In order
27   to achieve and maintain these objectives, the County and the Sheriff agree to
28

1 │ continue, and where appropriate enhance, their current policies and practices, and
2 │ to implement the additional measures set forth in this Agreement.
3 │     17.    The Parties recognize that the County and the Sheriff have made
4 │ considerable progress to improve conditions and the delivery of mental health care
5 │ at the Jails, but that additional measures are necessary to provide prisoners at the
6 │ Jails with safe and secure conditions, ensure their reasonable safety from harm,
7 │ including serious risk from self-harm and excessive force, and meet the serious
8 │ mental health needs of prisoners, in accordance with prisoners' constitutional
9 │ rights.  The measures set forth in this Agreement address the following areas:  (1)
10 │ training; (2) suicide hazard inspections; (3) intake; (4) medical records; (5) mental
11 │ health referrals; (6) mental health follow-up; (7) suicide risk procedures; (8)
12 │ staffing; (9) environmental conditions; (10) allowable property privileges; (11)
13 │ communication related to mental health; (12) safety checks; (13) quality
14 │ improvement plan; (14) mental health housing; (15) medication; (16) restraints;
15 │ (17) suicide death reviews and critical incident reviews; (18) mental health
16 │ treatment; and (19) use of force.   The County and the Sheriff agree to maintain an
17 │ adequate system of mental health screening, assessment, treatment planning, and
18 │ record-keeping as specifically set forth in this Agreement.

19 │ **V.   SUBSTANTIVE PROVISIONS**

20 │ **A.    Training**

21 │     18.    Within three months of the Effective Date, the County and the Sheriff
22 │ will develop, and within six months of the Effective Date will commence
23 │ providing:  (1) a four-hour custody-specific, scenario-based, skill development
24 │ training on suicide prevention, which can be part of the eight-hour training
25 │ described in paragraph 4.8 of the Implementation Plan in *Rosas* to all new
26 │ Deputies as part of the Jail Operations Continuum and to all new Custody
27 │ Assistants at the Custody Assistants academy; and (2) a two-hour custody-specific,
28 │ scenario-based, skill development training on suicide prevention to all existing

13

1 Deputies and Custody Assistants at their respective facilities, which can be part of
2 the eight-hour training described in paragraph 4.7 of the Implementation Plan in
3 *Rosas*, through in-service Intensified Formatted Training, which training will be
4 completed by December 31, 2016.

5      These trainings will include the following topics:

6   (a)   suicide prevention policies and procedures, including observation and
7        supervision of prisoners at risk for suicide or self-injurious behavior;
8   (b)   discussion of facility environments and staff interactions and why
9        they may contribute to suicidal behavior;
10  (c)   potential predisposing factors to suicide;
11  (d)   high-risk suicide periods and settings;
12  (e)   warning signs and symptoms of suicidal behavior;
13  (f)   case studies of recent suicides and serious suicide attempts;
14  (g)   emergency notification procedures;
15  (h)   mock demonstrations regarding the proper response to a suicide
16        attempt, including a hands-on simulation experience that incorporates
17        the challenges that often accompany a jail suicide, such as cell doors
18        being blocked by a hanging body and delays in securing back-up
19        assistance;
20  (i)   differentiating between suicidal and self-injurious behavior; and
21  (j)   the proper use of emergency equipment.
22  19.   Commencing July 1, 2015, the County and the Sheriff will provide:
23  (a)   Custody-specific, scenario-based, skill development training to new
24        Deputies during their Jail Operations training, and to existing
25        Deputies assigned to Twin Towers Correctional Facility, Inmate
26        Reception Center, Men's Central Jail, the Mental Health Housing
27        Units at Century Regional Detention Facility, and the Jail Mental
28

14

1   Evaluation Teams ("JMET") at North County Correctional Facility as
2   follows:
3   (i)   32 hours of Crisis Intervention and Conflict Resolution as
4         described in paragraphs 4.6 and 4.9 of the Implementation Plan
5         in *Rosas* to be completed within the time frames established in
6         that case (currently December 31, 2016). Deputies at these
7         facilities will receive an eight hour refresher course consistent
8         with paragraph 4.6 of the Implementation Plan in *Rosas* every
9         other year until termination of court jurisdiction in that case and
10        then a four hour refresher course every other year thereafter.
11  (ii)  Eight hours identifying and working with mentally ill prisoners
12        as described in paragraph 4.7 of the Implementation Plan in
13        *Rosas* to be completed by December 31, 2016. This training
14        requirement may be a part of the 32-hour training described in
15        the previous subsection. Deputies at these facilities will receive
16        a four hour refresher course consistent with paragraph 4.7 of the
17        Implementation Plan in *Rosas* every other year thereafter.
18  (b)   Commencing July 1, 2015, the County and the Sheriff will ensure that
19        new Custody Assistants receive eight hours of training in the Custody
20        Assistant academy, and that all existing Custody Assistants receive
21        eight hours of training, related to identifying and working with
22        mentally ill prisoners as described in paragraph 4.7 of the
23        Implementation Plan in *Rosas*. This training will be completed by
24        December 31, 2016. Custody Assistants will receive a four hour
25        refresher course consistent with paragraph 4.7 of the Implementation
26        Plan in *Rosas* every other year thereafter.
27  20.   Commencing no later than July 1, 2017, the County and the Sheriff
28  will provide:

15

      (a)      Custody-specific, scenario-based, skill development training to existing Deputies assigned to North County Correctional Facility, Pitchess Detention Center, and the non-Mental Health Housing Units in Century Regional Detention Facility as follows:

           (i)      32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed by December 31, 2019.  Deputies at these facilities will receive an eight hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four hour refresher course every other year thereafter.

           (ii)     Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2019.  This training requirement may be a part of the 32-hour training described in the previous subsection.  Deputies at these facilities will receive a four hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

21.    Consistent with existing Sheriff's Department policies regarding training requirements for sworn personnel, the County and the Sheriff will ensure that existing custody staff that have contact with prisoners maintain active certification in cardiopulmonary resuscitation and first aid.

22.    Within six months of the Effective Date and at least annually thereafter, the County and the Sheriff will provide instructional material to all Sheriff station personnel, Sheriff court personnel, custody booking personnel, and outside law enforcement agencies on the use of arresting and booking documents, including the Arrestee Medical Screening Form, to ensure the sharing of known

16

relevant and available information on prisoners' mental health status and suicide

risk.  Such instructional material will be in addition to the training provided to all

custody booking personnel regarding intake.

    **B.**    <u>**Suicide Hazard Inspections**</u>

    23.    Within three months of the Effective Date, the County and the Sheriff

will commence a systematic review of all prisoner housing, beginning with the

Mental Health Unit of the Correctional Treatment Center, all High Observation

Housing areas, all Moderate Observation Housing areas, single-person discipline,

and areas in which safety precautions are implemented, to reduce the risk of self-

harm and to identify and address suicide hazards.  The County and the Sheriff will

utilize a nationally-recognized audit tool for the review.  From this tool, the County

and the Sheriff will:

    (a)    develop short and long term plans to reasonably mitigate suicide

                 hazards identified by this review; and

    (b)    prioritize planning and mitigation in areas where suicide precautions

                 are implemented and seek reasonable mitigation efforts in those areas.

    24.    The County and the Sheriff will review and inspect housing areas on

at least an annual basis to identify suicide hazards.

    **C.**    <u>**Intake**</u>

    25.    The County and the Sheriff will ensure that any prisoner in a Sheriff's

Department station jail who verbalizes or who exhibits a clear and obvious

indication of current suicidal intent will be transported to IRC, CRDF, or a medical

facility as soon as practicable.  Pending transport, such prisoners will be under

unobstructed visual observation, or in a suicide resistant location with safety

checks every 15 minutes.

    26.    Consistent with existing Sheriff's Department policies, the County

and the Sheriff will follow established screening procedures to identify prisoners

with emergent or urgent mental health needs based upon information contained in

17

1  the Arrestee Medical Screening Form (SH-R-422) or its equivalent and the
2  Medical/Mental Health Screening Questionnaire and to expedite such prisoners for
3  mental health evaluation upon arrival at the Jail Reception Centers and prior to
4  routine screening.  Prisoners who are identified as having emergent or urgent
5  mental health needs, including the need for emergent psychotropic medication, will
6  be evaluated by a QMHP as soon as possible but no later than four hours from the
7  time of identification.
8      27.    Consistent with existing Sheriff's Department policies, the County
9  and the Sheriff will ensure that all prisoners are individually and privately screened
10  by Qualified Medical Staff or trained custody personnel as soon as possible upon
11  arrival to the Jails, but no later than 12 hours, barring an extraordinary
12  circumstance, to identify a prisoner's need for mental health care and risk for
13  suicide or self-injurious behavior.  The County and the Sheriff will ensure that the
14  Medical/Mental Health Screening Questionnaire, the Arrestee Medical Screening
15  Form (SH-R-422) or its equivalent, and/or the Confidential Medical Mental Health
16  Transfer Form are in the prisoner's electronic medical record or otherwise
17  available at the time the prisoner is initially assessed by a QMHP.
18      28.    The County and the Sheriff will ensure that any prisoner who has been
19  identified during the intake process as having emergent or urgent mental health
20  needs as described in Paragraph 26 of this Agreement will be expedited through
21  the booking process.  While the prisoner awaits evaluation, the County and the
22  Sheriff will maintain unobstructed visual observation of the prisoner when
23  necessary to protect his or her safety, and will conduct 15-minute safety checks if
24  the prisoner is in a cell.
25      29.    The County and the Sheriff will ensure that a QMHP conducts a
26  mental health assessment of prisoners who have non-emergent mental health needs
27  within 24 hours (or within 72 hours on weekends and legal holidays) of a
28  registered nurse conducting an intake nursing assessment at IRC or CRDF.

18

30.     Consistent with existing DMH policies, the initial mental health assessment will include a brief initial treatment plan.  The initial treatment plan will address housing recommendations and preliminary discharge information.  During the initial assessment, a referral will be made for a more comprehensive mental health assessment if clinically indicated.  The initial assessment will identify any immediate issues and determine whether a more comprehensive mental health evaluation is indicated.  The Monitor and SMEs will monitor whether the housing recommendations in the initial treatment plan have been followed.

**D.     Medical Records**

31.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will maintain electronic mental health alerts in prisoners' electronic medical records that notify medical and mental health staff of a prisoner's risk for suicide or self-injurious behavior.  The alerts will be for the following risk factors:

(a)     current suicide risk;

(b)     hoarding medications; and

(c)     prior suicide attempts.

32.     Information regarding a serious suicide attempt will be entered in the prisoner's electronic medical record in a timely manner.

33.     The County will require mental health supervisors in the Jails to review electronic medical records on a quarterly basis to assess their accuracy as follows:

(a)     Supervisors will randomly select two prisoners from each clinician's caseload in the prior quarter;

(b)     Supervisors will compare records for those prisoners to corroborate clinician attendance, units of service, and any unusual trends, including appropriate time spent with prisoners, recording more units

19

1    of service than hours worked, and to determine whether contacts with
2    those prisoners are inconsistent with their clinical needs;

3    (c)    Where supervisors identify discrepancies through these reviews, they
4        will conduct a more thorough review using a DMH-developed
5        standardized tool and will consider detailed information contained in
6        the electronic medical record and progress notes;

7    (d)    Serious concerns remaining after the secondary review will be
8        elevated for administrative action in consultation with DMH's
9        centralized Human Resources.

10    34.    The County and the Sheriff will conduct discharge planning and
11 linkage to community mental health providers and aftercare services for all
12 prisoners with serious mental illness as follows:

13    (a)    For prisoners who are in Jail seven days or less, a preliminary
14        treatment plan, including discharge information, will be developed.

15    (b)    For prisoners who are in Jail more than seven days, a QMHP will also
16        make available:

17        (i)    for prisoners who are receiving psychotropic medications, a 30-
18             day prescription for those medications will be offered either
19             through the release planning process, through referral to a re-
20             entry resource center, or through referral to an appropriate
21             community provider, unless clinically contraindicated;

22        (ii)    in-person consultation to address housing, mental
23             health/medical/substance abuse treatment, income/benefits
24             establishment, and family/community/social supports. This
25             consultation will also identify specific actions to be taken and
26             identify individuals responsible for each action;

27        (iii)    if the prisoner has an intense need for assistance, as described in
28             DMH policies, the prisoner will further be provided direct

20

1            linkage to an Institution for Mental Disease ("IMD"), IMD-

2            Step-down facility, or appropriately licensed hospital;

3      (iv)     if the prisoner has a moderate need for assistance, as described

4            in DMH policies, and as clinically appropriate to the needs of

5            the prisoner, the prisoner will be offered enrollment in Full

6            Service Partnership or similar program, placement in an Adult

7            Residential Facility ("Board and Care") or other residential

8            treatment facility, and direct assistance accessing community

9            resources; and

10      (v)     if the prisoner has minimal needs for assistance, as described in

11            DMH policies, the prisoner will be offered referrals to routine

12            services as appropriate, such as General Relief, Social Security,

13            community mental health clinics, substance abuse programs,

14            and/or outpatient care/support groups.

15    (c)     The County will provide a re-entry resource center with QMHPs

16            available to all prisoners where they may obtain information about

17            available mental health services and other community resources.

18    **E.**     **Mental Health Referrals**

19      35.     Consistent with existing DMH and Sheriff's Department policies, the

20 County and the Sheriff will ensure that custody staff, before the end of shift, refer

21 prisoners in general or special populations who are demonstrating a potential need

22 for routine mental health care to a QMHP or a Jail Mental Evaluation Team

23 ("JMET") member for evaluation, and document such referrals. Custody staff will

24 utilize the Behavior Observation and Referral Form.

25      36.     Consistent with existing DMH policies, the County and the Sheriff

26 will ensure that a QMHP performs a mental health assessment after any adverse

27 triggering event, such as a suicide attempt, suicide threat, self-injurious behavior,

28 or any clear decompensation of mental health status. For those prisoners who

1  repeatedly engage in self-injurious behavior, the County will perform such a
2  mental health assessment only when clinically indicated, and will, when clinically
3  indicated, develop an individualized treatment plan to reduce, and minimize
4  reinforcement of, such behavior.  The County and the Sheriff will maintain an on-
5  call system to ensure that mental health assessments are conducted within four
6  hours following the notification of the adverse triggering event or upon notification
7  that the prisoner has returned from a medical assessment related to the adverse
8  triggering event.  The prisoner will remain under unobstructed visual observation
9  by custody staff until a QMHP has completed his or her evaluation.

10       37.     Sheriff's Court Services Division staff will complete a Behavioral
11  Observation and Mental Health Referral Form and forward it to the Jail's mental
12  health and/or medical staff when the Court Services Division staff obtains
13  information that indicates a prisoner has displayed obvious suicidal ideation or
14  when the prisoner exhibits unusual behavior that clearly manifests self-injurious
15  behavior, or other clear indication of mental health crisis.  Pending transport, such
16  prisoner will be under unobstructed visual observation or subject to 15-minute
17  safety checks.

18       38.     Consistent with existing DMH policies and National Commission on
19  Correctional Health Care standards for jails, the County and the Sheriff will ensure
20  that mental health staff or JMET teams make weekly cell-by-cell rounds in
21  restricted non-mental health housing modules (e.g., administrative segregation,
22  disciplinary segregation) at the Jails to identify prisoners with mental illness who
23  may have been missed during screening or who have decompensated while in the
24  Jails.  In conducting the rounds, either the clinician, the JMET deputy, or the
25  prisoner may request an out-of-cell interview.  This request will be granted unless
26  there is a clear and documented security concern that would prohibit such an
27  interview or the prisoner has a documented history of repeated, unjustified requests
28  for such out-of-cell interviews.

22

39.     The County and the Sheriff will continue to use a confidential self-referral system by which all prisoners can request mental health care without revealing the substance of their request to custody staff or other prisoners.

40.     The County and the Sheriff will ensure a QMHP will be available on-site, by transportation of the prisoner, or through tele-psych 24 hours per day, seven days per week (24/7) to provide clinically appropriate mental health crisis intervention services.

**F.      Mental Health Follow Up**

41.     Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols that provide clinically appropriate transition when prisoners are discharged from FIP after being the subject of suicide watch. The protocols will provide:

(a)     intermediate steps between highly restrictive suicide measures (e.g., clinical restraints and direct constant observation) and the discontinuation of suicide watch;

(b)     an evaluation by a QMHP before a prisoner is removed from suicide watch;

(c)     every prisoner discharged from FIP following a period of suicide watch will be housed upon release in the least restrictive setting deemed clinically appropriate unless exceptional circumstances affecting the facility exist; and

(d)     all FIP discharges following a period of suicide watch will be seen by a QMHP within 72 hours of FIP release, or sooner if indicated, unless exceptional circumstances affecting the facility exist.

42.     Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols to ensure that prisoners admitted to HOH and placed on risk precautions are assessed by a QMHP.  As part of the assessment, the

23

1   QMHP will determine on an individualized basis whether to implement "step-
2   down" procedures for that prisoner as follows:

3       (a)    the prisoner will be assessed by a QMHP within three Normal
4              business work days, but not to exceed four Days, following
5              discontinuance of risk precautions;

6       (b)    the prisoner is counseled to ameliorate the negative psychological
7              impact that any restrictions may have had and in ways of dealing with
8              this impact;

9       (c)    the prisoner will remain in HOH or be transferred to MOH, as
10             determined on a case by case basis, until such assessment and
11             counseling is completed, unless exceptional circumstances affecting
12             the facility exist; and

13      (d)    the prisoner is subsequently placed in a level of care/housing as
14             determined by a QMHP.

15      43.    Within six months of the Effective Date, the County and the Sheriff
16  will develop and implement written policies for formal discipline of prisoners with
17  serious mental illness incorporating the following:

18      (a)    Prior to transfer, custody staff will consult with a QMHP to determine
19             whether assignment of a prisoner in mental health housing to
20             disciplinary housing is clinically contraindicated and whether
21             placement in a higher level of mental health housing is clinically
22             indicated, and will thereafter follow the QMHP's recommendation;

23      (b)    If a prisoner is receiving psychotropic medication and is placed in
24             disciplinary housing from an area other than mental health housing, a
25             QMHP will meet with that prisoner within 24 hours of such placement
26             to determine whether maintenance of the prisoner in such placement is
27             clinically contraindicated and whether transfer of the prisoner to

28

24

1   mental health housing is clinically appropriate, and custody staff will

2   thereafter follow the QMHP's recommendation;

3   (c)   A QMHP will participate in weekly walks, as specified in Paragraph

4   38, in disciplinary housing areas to observe prisoners in those areas

5   and to identify those prisoners with mental health needs;

6   (d)   Prior to a prisoner in mental health housing losing behavioral credits

7   for disciplinary reasons, the disciplinary decision-maker will receive

8   and take into consideration information from a QMHP regarding the

9   prisoner's underlying mental illness, the potential effects of the

10   discipline being considered, and whether transfer of the prisoner to a

11   higher level of mental health housing is clinically indicated.

12   **G.   Suicide Risk Procedures**

13   44.   Within six months of the Effective Date, the County and the Sheriff

14   will install protective barriers that do not prevent line-of-sight supervision on the

15   second floor tier of all High Observation Housing areas to prevent prisoners from

16   jumping off of the second floor tier.  Within six months of the Effective Date, the

17   County and the Sheriff will also develop a plan that identifies any other areas in

18   mental health housing where such protective barriers should be installed.

19   45.   Consistent with existing Sheriff's Department policies, the County

20   and the Sheriff will provide both a Suicide Intervention Kit that contains  an

21   emergency cut-down tool and a first-aid kit in the control booth or officer's station

22   of each housing unit.  All custody staff who have contact with prisoners will know

23   the location of the Suicide Intervention Kit and first-aid kit and be trained to use

24   their contents.

25   46.   The County and the Sheriff will immediately interrupt, and if

26   necessary, provide appropriate aid to, any prisoner who threatens or exhibits self-

27   injurious behavior.

28   **H.   Staffing**

25

47.     The County and the Sheriff will ensure there are sufficient custodial, medical, and mental health staff at the Jails to fulfill the terms of this Agreement. Within six months of the Effective Date, and on a semi-annual basis thereafter, the County and the Sheriff will, in conjunction with the requirements of Paragraph 92 of this Agreement, provide to the Monitor and DOJ a report identifying the steps taken by the County and the Sheriff during the review period to implement the terms of this Agreement and any barriers to implementation, such as insufficient staffing levels at the Jails, if any.  The County and the Sheriff will retain staffing records for two years to ensure that for any critical incident or non-compliance with this Agreement, the Monitor and DOJ can obtain those records to determine whether staffing levels were a factor in that critical incident and/or non-compliance.

**I.     Environmental Conditions**

48.     Within three months of the Effective Date, the County and the Sheriff will have written housekeeping, sanitation, and inspection plans to ensure the proper cleaning of, and trash collection and removal in, housing, shower, and medical areas, in accordance with California Code of Regulations ("CCR") Title 15 § 1280: Facility Sanitation, Safety, and Maintenance.

49.     Within three months of the Effective Date, the County and the Sheriff will have a maintenance plan to respond to routine and emergency maintenance needs, including ensuring that shower, toilet, sink, and lighting units, and heating, ventilation, and cooling systems are adequately maintained and installed.  The plan will also include steps to treat large mold infestations.

50.     Consistent with existing Sheriff's Department policies regarding control of vermin, the County and the Sheriff will provide pest control throughout the housing units, medical units, kitchen, and food storage areas.

51.     Consistent with existing Sheriff's Department policies regarding personal care items and supplies for inmates, the County and the Sheriff will

26

1  ensure that all prisoners have access to basic hygiene supplies, in accordance with
2  CCR Title 15 § 1265: Issue of Personal Care Items.
3  **J.    Allowable Property Privileges**
4       52.    The County and the Sheriff will implement policies governing
5  property restrictions in High Observation Housing that provide:
6       (a)    Except when transferred directly from FIP, upon initial placement in
7              HOH:
8              (i)    Suicide-resistant blankets, gowns, and mattresses will be
9                     provided until the assessment set forth in section (a)(ii) below is
10                    conducted, unless clinically contraindicated as determined and
11                    documented by a QMHP.
12             (ii)   Within 24 hours, a QMHP will make recommendations
13                    regarding allowable property based upon an individual clinical
14                    assessment.
15      (b)    Property restrictions in HOH beyond 24 hours will be based on
16             clinical judgment and assessment by a QMHP as necessary to ensure
17             the safety and well-being of the prisoner and documented in the
18             Electronic Medical Record.
19      53.    If otherwise eligible for an education, work, or similar program, a
20  prisoner's mental health diagnosis or prescription for medication alone will not
21  preclude that prisoner from participating in said programming.
22      54.    Prisoners who are not in Mental Health Housing will not be denied
23  privileges and programming based solely on their mental health status or
24  prescription for psychotropic medication.
25  **K.    Communication Related to Mental Health**
26      55.    Relevant custody, medical, and mental health staff in all High
27  Observation Housing units will meet on Normal business work days and such staff
28  in all Moderate Observation Housing units will meet at least weekly to ensure

27

1  coordination and communication regarding the needs of prisoners in mental health
2  housing units as outlined in Custody Services Division Directive(s) regarding
3  coordination of mental health treatment and housing.  When a custody staff
4  member is serving as a member of a treatment team, he or she is subject to the
5  same confidentiality rules and regulations as any other member of the treatment
6  team, and will be trained in those rules and regulations.

7       56.    Consistent with existing DMH and Sheriff's Department policies, the
8  County and the Sheriff will ensure that custody, medical, and mental health staff
9  communicate regarding any change in a prisoner's housing assignment following a
10 suicide threat, gesture, or attempt, or other indication of an obvious and serious
11 change in mental health condition.

12 **L.    Safety Checks**

13       57.    Within three months of the Effective Date, the County and the Sheriff
14 will revise and implement their policies on safety checks to ensure a range of
15 supervision for prisoners housed in Mental Health Housing.  The County and the
16 Sheriff will ensure that safety checks in Mental Health Housing are completed and
17 documented in accordance with policy and regulatory requirements as set forth
18 below:

19       (a)    Custody staff will conduct safety checks in a manner that allows staff
20              to view the prisoner to assure his or her well-being and security.
21              Safety checks involve visual observation and, if necessary to
22              determine the prisoner's well-being, verbal interaction with the
23              prisoner;

24       (b)    Custody staff will document their checks in a format that does not
25              have pre-printed times;

26       (c)    Custody staff will stagger checks to minimize prisoners' ability to
27              plan around anticipated checks;

28

28

1      (d)    Video surveillance may not be used to replace rounds and supervision

2              by custodial staff unless new construction is built specifically with

3              constant video surveillance enhancements and could only be used to

4              replace 15 minute checks in non-FIP housing, subject to approval by

5              the Monitor;

6      (e)    A QMHP, in coordination with custody (and medical staff if

7              necessary), will determine mental health housing assignments.

8      (f)    Supervision of prisoners in mental health housing will be conducted at

9              the following intervals:

10        (i)    FIP:  Custody staff will perform safety checks every 15

11                 minutes.  DMH staff will perform direct constant observation or

12                 one-to-one observation when determined to be clinically

13                 appropriate;

14        (ii)    High Observation Housing:  Every 15 minutes;

15        (iii)    Moderate Observation Housing:  Every 30 minutes.

16      58.    Within three months of the Effective Date, the County and the Sheriff

17  will revise and implement their policies on safety checks.  The County and the

18  Sheriff will ensure that safety checks in non-mental health housing units are

19  completed and documented in accordance with policy and regulatory requirements

20  as set forth below:

21      (a)    At least every 30 minutes in housing areas with cells;

22      (b)    At least every 30 minutes in dormitory-style housing units where the

23              unit does not provide for unobstructed direct supervision of prisoners

24              from a security control room.

25      (c)    Where a dormitory-style housing unit does provide for unobstructed

26              direct supervision of prisoners, safety checks must be completed

27              inside the unit at least every 60 minutes;

28

(d) At least every 60 minutes in designated minimum security dormitory housing at PDC South, or other similar campus-style unlocked dormitory housing;

(e) Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security. Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

(f) Custody staff will document their checks in a format that does not have pre-printed times;

(g) Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks; and

(h) Video surveillance may not be used to replace rounds and supervision by custodial staff.

59. Consistent with existing Sheriff's Department policies regarding uniform daily activity logs, the County and the Sheriff will ensure that a custodial supervisor conducts unannounced daily rounds on each shift in the prisoner housing units to ensure custodial staff conduct necessary safety checks and document their rounds.

**M.   Quality Improvement Plan**

60. Within six months of the Effective Date, the Department of Mental Health, in cooperation with the Sheriff's Unit described in Paragraph 77 of this Agreement, will implement a quality improvement program to identify and address clinical issues that place prisoners at significant risk of suicide or self-injurious behavior.

61. The quality improvement program will review, collect, and aggregate data in the following areas and recommend corrective actions and systemic improvements:

30

1    (a)    Suicides and serious suicide attempts:

2        (i)    Prior suicide attempts or other serious self-injurious behavior

3        (ii)    Locations

4        (iii)    Method

5        (iv)    Lethality

6        (v)    Demographic information

7        (vi)    Proximity to court date;

8    (b)    Use of clinical restraints;

9    (c)    Psychotropic medications;

10    (d)    Access to care, timeliness of service, and utilization of the Forensic In-patient Unit; and

12    (e)    Elements of documentation and use of medical records.

62. The County and the Sheriff's Unit described in Paragraph 77 of this Agreement will develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**N.    Mental Health Housing**

63. The County and the Sheriff will maintain adequate High Observation Housing and Moderate Observation Housing sufficient to meet the needs of the jail population with mental illness, as assessed by the County and the Sheriff on an ongoing basis. The County will continue its practice of placing prisoners with mental illness in the least restrictive setting consistent with their clinical needs.

64. Within six months of the Effective Date, the County and the Sheriff will develop a short-term plan addressing the following 12-month period, and within 12 months of the Effective Date, the County and the Sheriff will develop a long-term plan addressing the following five-year period, to reasonably ensure the availability of licensed inpatient mental health care for prisoners in the Jails. The County and the Sheriff will begin implementation of each plan within 90 days of plan completion. These plans will describe the projected capacity required,

31

1  strategies that will be used to obtain additional capacity if it is needed, and identify
2  the resources necessary for implementation.  Thereafter, the County and the Sheriff
3  will review, and if necessary revise, these plans every 12 months.

4  **O.    Medication**

5       65.    Consistent with existing Sheriff's Department policies, the County
6  and the Sheriff will ensure that psychotropic medications are administered in a
7  clinically appropriate manner to prevent misuse, hoarding, and overdose.

8       66.    Consistent with existing DMH policies, prisoners in High Observation
9  Housing and Moderate Observation Housing, and those with a serious mental
10 illness who reside in other housing areas of the Jails, will remain on an active
11 mental health caseload and receive clinically appropriate mental health treatment,
12 regardless of whether they refuse medications.

13      67.    Within three months of the Effective Date, the County and the Sheriff
14 will implement policies for prisoners housed in High Observation Housing and
15 Moderate Observation Housing that require:

16     (a)    documentation of a prisoner's refusal of psychotropic medication in
17           the prisoner's electronic medical record;

18     (b)    discussion of a prisoner's refusal in treatment team meetings;

19     (c)    the use of clinically appropriate interventions with such prisoners to
20           encourage medication compliance;

21     (d)    consideration of the need to transfer non-compliant prisoners to higher
22           levels of mental health housing; and

23     (e)    individualized consideration of the appropriateness of seeking court
24           orders for involuntary medication pursuant to the provisions of
25           California Welfare and Institutions Code sections 5332-5336 and/or
26           California Penal Code section 2603(a).

27      68.    Within six months of the Effective Date, the County and the Sheriff
28 will develop and implement a procedure for contraband searches on a regular, but

1  staggered basis in all housing units.  High Observation Housing cells will be

2  visually inspected prior to initial housing of inmates with mental health issues.

3

4  **P.  Restraints**

5      69.    Consistent with existing DMH policies regarding use of clinical

6  restraints, the County and the Sheriff will use clinical restraints only in the

7  Correctional Treatment Center and only with the approval of a licensed psychiatrist

8  who has performed an individualized assessment and an appropriate Forensic

9  Inpatient order.  Use of clinical restraints in CTC will be documented in the

10 prisoner's electronic medical record.  The documentation will include the basis for

11 and duration of the use of clinical restraints and the performance and results of the

12 medical welfare checks on restrained prisoners.  When applying clinical restraints,

13 custody staff will ensure a QMHP is present to document and monitor the

14 condition of the prisoner being placed in clinical restraints.

15     70.    Within three months of the Effective Date, the County and the Sheriff

16 will have policies and procedures regarding the use of Security Restraints in HOH

17 and MOH.  Such policies will provide that:

18     (a)    Security Restraints in these areas will not be used as an alternative to

19             mental health treatment and will be used only when necessary to

20             insure safety;

21     (b)    Security Restraints will not be used to punish prisoners, but will be

22             used only when there is a threat or potential threat of physical harm,

23             destruction of property, or escape;

24     (c)    Custody staff in HOH and MOH will consider a range of security

25             restraint devices and utilize the least restrictive option, for the least

26             amount of time, necessary to provide safety in these areas;

27     (d)    Whenever a prisoner is recalcitrant, as defined by Sheriff's

28             Department policy, and appears to be in a mental health crisis,

33

1    Custody staff will request a sergeant and immediately refer the
2    prisoner to a QMHP.

3    71.    The County and the Sheriff will ensure that any prisoner subjected to
4    clinical restraints in response to a mental health crisis receives therapeutic services
5    to remediate any effects from the episode(s) of restraint.

6    **Q.    Suicide Death Reviews and Critical Incident Reviews**

7    72.    The County and the Sheriff will develop and implement policies and
8    procedures that ensure that incidents involving suicide and serious self-injurious
9    behavior are reported and reviewed to determine:  (a) whether staff engaged in any
10   violations of policies, rules, or laws; and (b) whether any improvements to policy,
11   training, operations, treatment programs, or facilities are warranted.  These policies
12   and procedures will define terms clearly and consistently to ensure that incidents
13   are reported and tracked accurately by DMH and the Sheriff's Department.

14   73.    Depending on the level of severity of an incident involving a prisoner
15   who threatens or exhibits self-injurious behavior, a custody staff member will
16   prepare a detailed report (Behavioral Observation and Mental Health Referral
17   Form, Inmate Injury Report, and/or Incident Report) that includes information
18   from individuals who were involved in or witnessed the incident as soon as
19   practicable, but no later than the end of shift.  The report will include a description
20   of the events surrounding the incident and the steps taken in response to the
21   incident.  The report will also include the date and time that the report was
22   completed and the names of any witnesses.  The Sheriff's Department will
23   immediately notify the County Office of Inspector General of all apparent or
24   suspected suicides occurring at the Jails.

25   74.    The Sheriff's Department will ensure that there is a timely, thorough,
26   and objective law enforcement investigation of any suicide that occurs in the Jails.
27   Investigations shall include recorded interviews of persons involved in, or who
28   witnessed, the incident, including other prisoners.  Sheriff's Department personnel

34

1   who are investigating a prisoner suicide or suspected suicide at the Jails will ensure

2   the preservation of all evidence, including physical evidence, relevant witness

3   statements, reports, videos, and photographs.

4        75.    Within three months of the Effective Date, the County and the Sheriff

5   will review every suicide attempt that occurs in the Jails as follows:

6        (a)    Within two working days, DMH staff will review the incident, the

7               prisoner's mental health status known at the time of the incident, the

8               need for immediate corrective action if any, and determine the level of

9               suicide attempt pursuant to the Centers for Disease Control and

10              Prevention's Risk Rating Scale;

11       (b)    Within 30 working days, and only for those incidents determined to be

12              a serious suicide attempt by DMH staff after the review described in

13              subsection (a) above, management and command-level personnel

14              from DMH and the Sheriff's Department (including Custody Division

15              and Medical Services Bureau) will meet to review relevant

16              information known at that time, including the events preceding and

17              following the incident, the prisoner's incarceration, mental health, and

18              health history, the status of any corrective actions taken, and the need

19              for additional corrective action if necessary;

20       (c)    The County and the Sheriff will document the findings that result

21              from the review of serious suicide attempts described in subsection (b)

22              above; and

23       (d)    The County and the Sheriff will ensure that information for all suicide

24              attempts is input into a database for tracking and statistical analysis.

25       76.    The County and the Sheriff will review every apparent or suspected

26   suicide that occurs in the Jails as follows:

27       (a)    Within no more than two working days, management and command-

28              level personnel from DMH and the Sheriff's Department (including

35

1     Custody Division and Medical Services Bureau) will meet to review

2     and discuss the suicide, the prisoner's mental health status known at

3     the time of the suicide, and the need for immediate corrective or

4     preventive action if any;

5   (b)   Within seven working days, and again within 30 working days,

6     management and command-level personnel from DMH and the

7     Sheriff's Department (including Custody Division and Medical

8     Services Bureau) will meet to review relevant information known at

9     that time, including the events preceding and following the suicide,

10     the prisoner's incarceration, mental health, and health history, the

11     status of any corrective or preventive actions taken, and the need for

12     additional corrective or preventive action if necessary;

13   (c)   Within six months of the suicide, the County and the Sheriff will

14     prepare a final written report regarding the suicide. The report will

15     include:

16     (i)   time and dated incident reports and any supplemental reports

17       with the same Uniform Reference Number (URN) from custody

18       staff who were directly involved in and/or witnessed the

19       incident;

20     (ii)   a timeline regarding the discovery of the prisoner and any

21       responsive actions or medical interventions;

22     (iii)   copies of a representative sample of material video recordings

23       or photographs, to the extent that inclusion of such items does

24       not interfere with any criminal investigation;

25     (iv)   a reference to, or reports if available, from the Sheriff's

26       Department Homicide Bureau;

27     (v)   reference to the Internal Affairs Bureau or other personnel

28       investigations, if any, and findings, if any;

36

1         (vi)     a Coroner's report, if it is available at the time of the final
2                  report, and if it is not available, a summary of efforts made to
3                  obtain the report;
4         (vii)    a summary of relevant information discussed at the prior review
5                  meetings, or otherwise known at the time of the final report,
6                  including analysis of housing or classification issues if relevant;
7       (viii)   a clinical mortality review;
8         (ix)     a Psychological Autopsy utilizing the National Commission on
9                  Correctional Health Care's standards; and
10        (x)      a summary of corrective actions taken and recommendations
11                 regarding additional corrective actions if any are needed.

77. The County and the Sheriff will create a specialized unit to oversee, monitor, and audit the County's jail suicide prevention program in coordination with the Department of Mental Health. The Unit will be headed by a Captain, or another Sheriff's Department official of appropriate rank, who reports to the Assistant Sheriff for Custody Operations through the chain of command. The Unit will be responsible for:

(a) Ensuring the timely and thorough administrative review of suicides and serious suicide attempts in the Jails as described in this Agreement;

(b) Identifying patterns and trends of suicides and serious suicide attempts in the Jails, keeping centralized records and inputting data into a unit database for statistical analysis, trends, and corrective action, if necessary;

(c) Ensuring that corrective actions are taken to mitigate suicide risks at both the location of occurrence and throughout the concerned system by providing, or obtaining where appropriate, technical assistance to

37

1  other administrative units within the Custody Division when such
2  assistance is needed to address suicide-risk issues;

3  (d)  Analyzing staffing, personnel/disciplinary, prisoner classification, and
4       mental health service delivery issues as they relate to suicides and
5       serious suicide attempts to identify the need for corrective action
6       where appropriate; and recommend remedial measures, including
7       policy revisions, re-training, or staff discipline, to address the
8       deficiencies and ensure implementation; and

9  (e)  Participating in meetings with DMH to develop, implement, and track
10      corrective action plans addressing recommendations of the quality
11      improvement program.

12  78.  The County and the Sheriff will maintain a county-level Suicide
13  Prevention Advisory Committee that will be open to representatives from the
14  Sheriff's Department Custody Division, Court Services, Custody Support Services,
15  and Medical Services Bureau; the Department of Mental Health; the Public
16  Defender's Office; County Counsel's Office; the Office of the Inspector General;
17  and the Department of Mental Health Patients' Rights Office.  The Suicide
18  Prevention Advisory Committee will meet twice per year and will serve as an
19  advisory body to address system issues and recommend coordinated approaches to
20  suicide prevention in the Jails.

21  **R.   <u>Mental Health Treatment</u>**

22  79.  (a) Unless clinically contraindicated, the County and the Sheriff will
23  offer prisoners in mental health housing:

24       (i)   therapeutically appropriate individual visits with a QMHP;
25       (ii)  therapeutically appropriate group programming conducted by a
26             QMHP or other appropriate provider that does not exceed 90
27             minutes per session;

28

38

1    (b) The County and the Sheriff will provide prisoners outside of mental
2    health housing with medication support services when those prisoners are
3    receiving psychotropic medications and therapeutically appropriate individual
4    monthly visits with a QMHP when those prisoners are designated as Seriously
5    Mentally Ill.
6    (c) The date, location, topic, attendees, and provider of programming or
7    therapy sessions will be documented.  A clinical supervisor will review
8    documentation of group sessions on a monthly basis.
9    80.    (a)    The County and the Sheriff will continue to make best efforts to
10   provide appropriate out-of-cell time to all prisoners with serious mental illness,
11   absent exceptional circumstances, and unless individually clinically
12   contraindicated and documented in the prisoner's electronic medical record.  To
13   implement this requirement, the County and the Sheriff will follow the schedule
14   below:
15           (i)     By no later than six months after the Effective Date, will offer
16                   25% of the prisoners in HOH ten hours of unstructured out-of-
17                   cell recreational time and ten hours of structured therapeutic or
18                   programmatic time per week;
19           (ii)    By no later than 12 months after the Effective Date, will offer
20                   50% of the prisoners in HOH ten hours of unstructured out-of-
21                   cell recreational time and ten hours of structured therapeutic or
22                   programmatic time per week;
23           (iii)   By no later than 18 months after the Effective Date, will offer
24                   100% of the prisoners in HOH ten hours of unstructured out-of-
25                   cell recreational time and ten hours of structured therapeutic or
26                   programmatic time per week.
27   (b)    No later than six months after the Effective Date, the County and the
28   Sheriff will record at the end of each day which prisoners in HOH, if any, refused

39

1  to leave their cells that day.  That data will be presented and discussed with DMH

2  staff at the daily meeting on the following Normal business work day.  The data

3  will also be provided to the specialized unit described in Paragraph 77 and to

4  DMH's quality improvement program to analyze the data for any trends and to

5  implement any corrective action(s) deemed necessary to maximize out-of-cell time

6  opportunities and avoid unnecessary isolation.

7      **S.**    **Use of Force**

8        81.    Except as specifically set forth in Paragraphs 18-20 of this

9  Agreement, and except as specifically identified below, the County and the Sheriff

10  will implement the following paragraphs of the Implementation Plan in *Rosas* at all

11  Jails facilities, including the Pitchess Detention Center and the Century Regional

12  Detention Facility, by no later than the dates set forth in the Implementation Plan

13  or as revised by the *Rosas* Monitoring Panel:  Paragraphs 2.2-2.13 (use of force

14  policies and practices); 3.1-3.6 (training and professional development); 4.1-4.10

15  (use of force on mentally ill prisoners); 5.1-5.3 (data tracking and reporting of

16  force); 6.1-6.20 (prisoner grievances and complaints); 7.1-7.3 (prisoner

17  supervision); 8.1-8.3 (anti-retaliation provisions); 9.1-9.3 (security practices); 10.1-

18  10.2 (management presence in housing units); 11.1 (management review of force);

19  12.1-12.5 (force investigations, with the training requirement of paragraph 12.1 to

20  be completed by December 31, 2016); 13.1-13.2 (use of force reviews and staff

21  discipline); 14.1-14.2 (criminal referrals and external review); 15.1-15.7

22  (documentation and recording of force); 16.1-16.3 (health care assessments); 17.1-

23  17.10 (use of restraints); 18.1-18.2 (adequate staffing); 19.1-19.3 (early warning

24  system); 20.1-20.3 (planned uses of force); and 21.1 (organizational culture).

25        82.    With respect to paragraph 6.16 of the *Rosas* Implementation Plan, the

26  County and the Sheriff will ensure that Sheriff's Department personnel responsible

27  for collecting prisoners' grievances as set forth in that paragraph are also co-

28  located in the Century Regional Detention Facility.

83.     The County and the Sheriff will install closed circuit security cameras throughout all Jails facilities' common areas where prisoners engage in programming, treatment, recreation, visitation, and intra-facility movement ("Common Areas"), including in the Common Areas at the Pitchess Detention Center and the Century Regional Detention Facility.  The County and the Sheriff will install a sufficient number of cameras in Jails facilities that do not currently have cameras to ensure that all Common Areas of these facilities have security-camera coverage.  The installation of these cameras will be completed no later than June 30, 2018, with TTCF, MCJ, and IRC completed by the Effective Date; CRDF completed by March 1, 2016; and the remaining facilities completed by June 30, 2018.  The County and the Sheriff will also ensure that all video recordings of force incidents are adequately stored and retained for a period of at least one year after the force incident occurs or until all investigations and proceedings related to the use of force are concluded, whichever happens later.

84.     The Sheriff will continue to maintain and implement policies for the timely and thorough investigation of alleged staff misconduct related to use of force and for timely disciplinary action arising from such investigations. Specifically:

(a)     Sworn custody staff subject to the provisions of California Government Code section 3304 will be notified of the completion of the investigation and the proposed discipline arising from force incidents in accordance with the requirements of that Code section; and

(b)     All non-sworn Sheriff's Department staff will be notified of the proposed discipline arising from force incidents in time to allow for the imposition of that discipline.

41

85.     The County and the Sheriff will ensure that Internal Affairs Bureau management and staff receive adequate specialized training in conducting investigations of misconduct.

86.     Within three months of the Effective Date, the County and the Sheriff will develop and implement policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical agents and other security equipment.  The County and the Sheriff will develop and maintain an adequate inventory control system for all weapons, including OC spray.

## VI.     IMPLEMENTATION, COMPLIANCE ASSESSMENT, ENFORCEMENT, AND TERMINATION

### A. Review and Implementation of Policies, Procedures, and Programs

87.     The County and the Sheriff are committed to continuous quality improvement and have taken significant steps to review and update policies and procedures to protect the constitutional and federal rights of prisoners at the Jails. Where necessary, the County and the Sheriff will maintain existing policies, procedures, and practices to support the substantive provisions in this Agreement.

88.     The County and the Sheriff will review all relevant policies, procedures, and other written executive-approved directives within four months of the Effective Date to ensure that they are consistent with the terms of this Agreement, unless they were reviewed and revised for such purposes within six months preceding the Effective Date.

89.     (a) If the County or the Sheriff create or materially revise a policy related to this Agreement after the Effective Date, the following process will be followed before implementation:

(1)     the County and Sheriff will provide a copy of the proposed policy to the Monitor and DOJ prior to its implementation;

(2)     the Monitor and DOJ will have 30 days to review the policy and submit comments, if any, to the County and the Sheriff;

42

(3)    if the Monitor and DOJ do not submit any comments within the 30-day period, the County and the Sheriff will begin implementation of the policy no later than 180 days after the expiration of the 30 day-review period or notice that no comments will be forthcoming;

(4)    if the Monitor or DOJ objects to the proposed policy, the Monitor or DOJ will note the objection in writing to all Parties within the respective review period;

(5)    if there is any objection to the proposed policy, the County and the Sheriff will have 30 days to address the objection(s);

(6)    if the Monitor and the Parties cannot resolve the objection(s), either Party may ask the Court to resolve the matter;

(7)    the Monitor may extend any time frame within this paragraph by up to 15 additional days.  Further extensions may be granted by the Monitor with the agreement of both Parties when necessary to permit amicable resolution of objections.

(b) If after the Effective Date, the County or the Sheriff is confronted with a critical circumstance requiring immediate action, the County or the Sheriff may create or substantially revise, and then implement, a policy related to this Agreement without the prior review of the Monitor and DOJ, so long as the review, comment, and objection procedures set forth above in subparagraph (a) are followed immediately upon implementation.

90.    The County and the Sheriff will provide relevant staff with any policy that is created or materially revised after the Effective Date if it relates to the provisions of this Agreement.  The County and the Sheriff will further document that any such policy has been received by that staff and that such staff has been trained, instructed, or briefed, as appropriate, on that policy.

**B. Compliance Coordination Unit**

91.    The County and the Sheriff will establish and maintain a compliance coordination unit for the duration of this Agreement. The unit will:

(a)    serve as a liaison between the Parties and the Monitor and assume primary responsibility for collecting information the Monitor requires to carry out the duties assigned to the Monitor;

(b)    maintain sufficient records to document that the requirements of this Agreement are being properly implemented (e.g., census summaries, policies, procedures, protocols, training materials, investigations, incident reports, tier logs, use-of-force reports);

(c)    provide written answers by electronic mail or other format when necessary and any documents requested by the Monitor or DOJ concerning implementation of this Agreement in a timely manner;

(d)    coordinate and monitor compliance and implementation activities, including coordination between Custody and DMH staff, and assist managers in assigning compliance tasks to County or Sheriff personnel; and

(e)    ensure that the County and the Sheriff notify DOJ and the Monitor of any suspected or apparent suicide within 24 hours and make related reports available to the Monitor and DOJ for inspection.

**C. Self-Assessments and Reports**

92.    (a)  Fifteen days before the end of the reporting period described in Paragraph 109 of this Agreement, the County and the Sheriff will provide the Monitor and DOJ a Self-Assessment Status Report that includes:

(1)    the actions taken by the County and the Sheriff during the review period to implement this Agreement including the status of ongoing and continuous improvement activities;

44

1      (2)    responses to concerns or recommendations made in prior reports by

2                 the Monitor;

3      (3)    a summary of any audits related to the provisions of this Agreement

4                 that were completed in the reporting period; and

5      (4)    relevant trend data including the information described in Paragraphs

6                 61 and 77(a).

7    (b)  Self-Assessment Status Reports prepared pursuant to this Paragraph will

8 be treated as confidential and not further disclosed or attached to any court

9 document, unless filed under seal with Court approval, without the consent of the

10 County and the Sheriff or by order of the Court.  The Monitor, SMEs, and other

11 monitoring staff, however, will be permitted to use the information contained in

12 the Self-Assessment Status Reports to prepare the Monitor's reports to the Court.

13   **D. Independent Monitor**

14     93.    In order to assess and report on the implementation of this Agreement

15 and whether the implementation is having the intended beneficial impact on

16 conditions at the Jails, the Monitor, the SMEs, and their staff will:

17      (a)    conduct the audits, reviews, and assessments specified in this

18                 Agreement;

19      (b)    review County and Sheriff policies, procedures, training curricula, and

20                 other documents related to this Agreement developed and

21                 implemented pursuant to this Agreement;

22      (c)    conduct such additional audits, reviews, and assessments consistent

23                 with this Agreement as the  Monitor and the Parties jointly agree are

24                 appropriate, or in the case of a dispute which the Parties cannot in

25                 good faith resolve, as ordered by the Court; and

26      (d)    evaluate the implementation of Section V.S. of this Agreement

27                 concerning use of force consistent with the Settlement Agreement and

28                 Implementation Plan-approved in *Rosas*.

94.     The Parties have selected Richard Drooyan as the Independent
Monitor.  The Monitor and his staff will not, and are not intended to, replace or
assume the role and duties of the County or the Sheriff and will have only the
duties, responsibilities, and authority conferred by this Agreement.

        To assess and report whether the provisions of this Agreement have been
implemented, and whether the County and the Sheriff are in compliance with the
substantive provisions of this Agreement, the Monitor will:

        (a)     evaluate the implementation of Section V ("Substantive Provisions")
                of this Agreement and, where applicable, the Settlement Agreement
                and Implementation Plan approved in *Rosas*;

        (b)     conduct specific audits, reviews, and assessments consistent with this
                Agreement or otherwise if the Parties agree in writing; and

        (c)     prepare reports as provided in this Agreement.

95.     The Parties have also selected Bruce C. Gage, M.D., and Manuel
David Romero as Subject Matter Experts ("SMEs").  The SMEs and their staff will
not, and are not intended to, replace or assume the role and duties of the County or
the Sheriff and will have only the duties, responsibilities, and authority conferred
by this Agreement.  The SMEs will, in conjunction with the Monitor, assess
compliance with the substantive provisions of this Agreement by providing
expertise within the scope of their subject matters.

96.     The Monitor and/or SMEs may hire or contract with additional
persons with knowledge or expertise not already provided by the SMEs, or where
delegation to a subordinate staff member would be appropriate, as reasonably
necessary to perform the tasks assigned by this Agreement.  The Monitor will
notify the County, the Sheriff, and DOJ in writing when the Monitor or SMEs are
considering such additional persons.  The Parties will have an opportunity, if
desired, to interview the candidate(s) and request reasonable information about the
candidate's background and experience.  If the Parties agree to the Monitor's

proposal, the Monitor or SMEs will be authorized to hire or contract such additional persons.  If the Parties do not agree to the proposal, the Parties will have ten business days to disagree with the proposal in writing.  The Parties will not unreasonably withhold approval.  If the Parties are unable to reach agreement within ten business days of receiving notice of this disagreement, the Court will resolve the dispute.

97.     If not already developed by the Monitor and SMEs and agreed-to by the Parties before the execution of this Agreement, within three months of the appointment of the Monitor and SMEs by the Court, the Monitor and SMEs will develop a plan for conducting the above audits, reviews, and assessments, and will submit that plan to the Parties for review and approval.  The plan will:

    (a)    set out a methodology for reviewing each of the substantive provisions of this Agreement, including which provisions will be assessed together, if any, and the thresholds for achieving Substantial Compliance; and

    (b)    set out a schedule for conducting the assessments required by this Agreement.

98.     The Monitor, SMEs, and any person hired or contracted to assist the Monitor or SMEs will be subject to (a) the supervision and orders of the Court consistent with the terms of this Agreement; (b) the terms of this Agreement; (c) any applicable law; and (d) security protocols while in the Jails.

99.     The County and the Sheriff will bear all reasonable fees and costs of the Monitor, the SMEs, and their staff.  Travel, lodging, and per diem expenses will be reimbursed at the same rate as provided for County employees.  In the event that any dispute arises regarding the reasonableness or payment of the Monitor's, SMEs', or their staff's fees and costs, the Parties and the Monitor will attempt to resolve the dispute cooperatively before seeking the assistance of the Court.

47

100.   At the request of the County and the Sheriff, and with the consent of the DOJ, the Monitor, SMEs, and their staff may provide technical assistance. Such assistance may not interfere with the Monitor's or SMEs' duties under this Agreement, create additional duties or obligations that are enforceable under this Agreement, or otherwise alter or modify the terms of this Agreement. Additionally, whenever the County or the Sheriff identifies and implements its own quality improvement measures that are not related to any of the terms of this Agreement, those quality improvement measures will not be monitored or enforced under this Agreement.

101.   Should all the Parties agree that the Monitor, a SME, or a member of their staff has exceeded his or her authority or is not fulfilling his or her duties in accordance with this Agreement, the Parties may petition the Court for the immediate removal and replacement of the Monitor, SME, or staff person.  After good faith attempts to resolve such issues informally, any Party may petition the Court for the removal of the Monitor, a SME, or any member of their staff, for good cause, which may include, but is not limited to:  gross neglect of duties; willful misconduct; inappropriate personal relationship with a Party, any Party employee, or prisoner; conflicts of interest; any criminal conduct; or any significant violations of security protocols during the pendency of this Agreement.

102.   The Parties recognize the Monitor and SMEs may have existing clients who may now be, or in the future may be, adverse to the County or the Sheriff in transactions or litigation.  For the duration of this Agreement, however, unless such conflict is waived by all Parties, the Monitor, the SMEs, and their staff will not accept any new employment or retention for consulting services regarding alleged actions or inactions by the County or the Sheriff, or any County or Sheriff's employee, including any actions or inactions involving any prisoner that present a conflict of interest with the Monitor's, SME's, or staff member's responsibilities under this Agreement, including being retained (on a paid or unpaid basis) by any

48

1   current or future litigant or claimant, or such litigant's or claimant's attorney, in

2   connection with a claim or suit against the County, the Sheriff, or their

3   departments, officers, agents, or employees.  Similarly, the Monitor, the SMEs,

4   and their staff will not accept employment or provide consulting services (on a

5   paid or unpaid basis) by any Defendant to this matter to act as a defense witness in

6   connection with a private claim or suit against the County, the Sheriff, or their

7   departments, officers, agents, or employees.  This provision does not apply to any

8   proceeding before a court related to performance of contracts or subcontracts for

9   monitoring this Agreement.

10   **E. Access and Confidentiality**

11       103.   With the exception of documents within the attorney-client and

12   attorney-work-product privileges, and notwithstanding the confidentiality

13   restrictions of the Health Insurance Portability and Accountability Act ("HIPAA"),

14   the California Confidentiality of Medical Information Act (Civil Code § 56, *et*

15   *seq*.), and California Welfare and Institutions Code § 5328 (related to

16   confidentiality of mental health records), the Monitor, SMEs, their staff, and the

17   United States, its attorneys, consultants, and agents will have full and complete

18   access to the Jails and all relevant individuals, facilities, prisoner medical and

19   mental health records, documents, data, and meetings related to the provisions of

20   this Agreement.

21       104.   Other than as expressly provided in this Agreement, the Monitor, the

22   SMEs, their staff, and DOJ will maintain confidential all, and will not distribute or

23   disclose any, non-public information provided by the County and the Sheriff

24   pursuant to this Agreement.  This Agreement will not be deemed a waiver of any

25   privilege or right the County or the Sheriff may assert, including those recognized

26   at common law or created by statute, rule, or regulation, against any other person

27   or entity with respect to the disclosure of any document or information.

28

49

F. **Public Statements, Testimony, and Records**

105.   Except as required by the terms of this Agreement, an order from the Court, the express written agreement of all Parties, or at meetings of the County of Los Angeles Board of Supervisors, the Monitor, SMEs, and their staff will not make any public or press statements (at a conference or otherwise), issue findings, offer expert opinion, or testify in any other litigation or proceeding regarding any matter or subject that he or she may have learned as a result of his or her performance under this Agreement.  If the Monitor, SMEs, or any of their staff receive a subpoena, he or she will promptly notify the Parties and thereafter advise the subpoenaing court of the terms of this Agreement.

106.   The Monitor, SMEs, and their staff will be permitted to initiate and receive ex parte communications with all Parties.

107.   The Monitor, SMEs, and their staff are not a State, County, or local agency, or an agent thereof, and accordingly, the records maintained by them, or any of them, will not be deemed public records subject to public inspection.  If the Monitor, SMEs, or any of their staff receive a request for inspection of their records related to this Agreement, he or she will promptly notify the Parties.

108.   This Agreement is enforceable only by the Parties.  No person or entity is intended to be a third-party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action, and accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreement.

G. **Monitoring Reports**

109.   Every six months, the Monitor will file public written reports with the Court describing the steps taken by the County and the Sheriff to implement this Agreement and evaluating the extent to which the County and the Sheriff have complied with this Agreement.  Specifically, the Monitor and SMEs will evaluate the status of compliance for each substantive provision of this Agreement using the

1 following standards:  (1) Substantial Compliance; (2) Partial Compliance; and (3)

2 Non-compliance.  In order to assess compliance, the Monitor and SMEs will

3 review a sufficient number of pertinent documents to accurately assess current

4 conditions, interview all relevant staff, interview a sufficient number of prisoners

5 to accurately assess current conditions, and take other reasonable actions consistent

6 with this Agreement, as needed, to fulfill their responsibilities under this

7 Agreement.  The Monitor, the SMEs, and their staff will be responsible for

8 independently verifying representations from the County or the Sheriff regarding

9 progress toward compliance, and examining supporting documentation.  Each

10 monitoring report will describe the steps taken by members of the monitoring team

11 to analyze conditions and assess compliance, including reference to the documents

12 reviewed and individuals interviewed, and the factual basis for the Monitor's and

13 SMEs' findings.  Such reports and findings will not be admissible by or against the

14 County or the Sheriff in any proceeding other than a proceeding related to the

15 enforcement of this Agreement initiated and handled exclusively by the County,

16 the Sheriff, or the United States.

17      110.   At least 30 days before the anticipated filing of such reports, the

18 Monitor will provide the Parties with a draft copy and an opportunity to respond.

19 The Monitor will consider the Parties' responses and make appropriate changes, if

20 any, before filing.  The Parties may file separate responses with the Court within

21 15 days after the filing by the Monitor although nothing in this Agreement will be

22 construed to require the filing of such responses.  All public court filings by the

23 Monitor and any Party will be written with due regard for the privacy interests of

24 individual prisoners and staff and the interest of the County and the Sheriff in

25 protecting against disclosure of information not permitted by this Agreement.

26      111.   Except for the provisions of Section V.S. of this Agreement that have

27 different Compliance Periods under the Settlement Agreement, Implementation

28 Plan, and Monitoring Protocols approved in *Rosas*, upon the Monitor's and SMEs'

1  conclusion that the County and the Sheriff have achieved and maintained
2  Substantial Compliance with a substantive provision of this Agreement for a period
3  of twelve (12) consecutive months, the Monitor and SMEs will no longer be
4  required to assess or report on that provision.  Where the Monitor and SMEs
5  conclude that the County and the Sheriff have achieved and maintained Substantial
6  Compliance with a substantive provision of this Agreement, as described
7  immediately above, at one Jail facility but not at other facilities, the Monitor and
8  SMEs will no longer be required to assess or report on that provision as it applies
9  to the facility found to be in sustained compliance.  The Parties expect that there
10  will be multiple independent operative compliance periods under the supervision
11  of the Monitor.

12      112.   If the Monitor identifies a critical and time sensitive issue that the
13  County or the Sheriff should address during a six-month reporting period and that
14  should not be delayed until the time the Monitor must provide the Parties with a
15  draft copy of the monitoring report, the Monitor will provide the Parties with a
16  verbal report on the critical issue as soon as possible, and the Monitor will provide
17  a written report to the Parties within 30 days of the Monitor's identification of the
18  critical issue.

19  **H. Court Jurisdiction, Modification, Enforcement, and Termination**

20      113.   The Court shall retain jurisdiction over the implementation of this
21  Agreement at the existing Jails or any other facility used to replace or supplement
22  the Jails for all purposes.

23      114.   The County and the Sheriff will ensure that all of the terms in this
24  Agreement are implemented.  Unless otherwise provided in a specific provision of
25  this Agreement, the implementation of this Agreement will begin immediately
26  upon the Effective Date.

27

28

115.   Unless otherwise agreed to under a specific provision of this Agreement, the County and the Sheriff will implement all provisions of this Agreement within six months of the Effective Date.

116.   To ensure that the substantive provisions of this Agreement are implemented in accordance with the terms of this Agreement, the Court will retain jurisdiction to enforce this Agreement only until either:

(a)   the County and the Sheriff have achieved and maintained Substantial Compliance with each and every substantive provision of this Agreement for a period of twelve (12) consecutive months (or other time period provided in a specific provision of this Agreement or the relevant Compliance Period under the Settlement Agreement, Implementation Plan, and Monitoring Protocols approved in *Rosas*); or

(b)   the Monitor, with Court approval, determines that the overall objectives and goals of this Agreement have been met even where the specific requirements of substantive provisions of this Agreement may be only in Partial Compliance.

Either of the conditions described in sub-paragraphs (a) or (b) above will be deemed to fully satisfy this Agreement. At that time, the County and the Sheriff may seek to terminate this Agreement with the Court consistent with the requirements of the Prison Litigation Reform Act, 18 U.S.C. § 3626(b).

117.   The United States acknowledges the good faith of the County and the Sheriff in committing to the reforms set forth in this Agreement. The United States, however, reserves the right to seek enforcement of the provisions of this Agreement with the Court if it determines that the County or the Sheriff has failed to substantially comply with any substantive provisions of this Agreement. Before pursuing any remedy with the Court, the United States agrees to give written notice to the County and the Sheriff in accordance with the Local Rules of the Central

53

1  District of California.  The County and the Sheriff will have 30 days from receipt
2  of such notice to cure the alleged failure (or such additional time as is reasonable
3  due to the nature of the issue and agreed upon by the Parties).  During the 30-day
4  period, the Parties will meet and confer in good faith to resolve any disputes
5  regarding the alleged failure or to otherwise explore a joint resolution.  The
6  Monitor and SMEs may assist the Parties in reaching a mutually agreeable
7  resolution to the alleged compliance failure, including facilitating conference
8  meetings and providing relevant factual assessments.
9         118.   In case of an emergency posing an imminent and serious threat to the
10  health or safety of any prisoner or staff member at the Jails, the United States may
11  omit the notice and cure requirements set forth above and seek enforcement of the
12  Agreement with the Court.
13         119.   The Parties may jointly stipulate to make changes, modifications, and
14  amendments to this Agreement, which will be effective absent further action from
15  the Court, 30 days after a stipulation signed by all of the Parties has been filed with
16  the Court.  Any Party may seek to modify this Agreement with the Court if that
17  Party establishes by a preponderance of the evidence that a significant change in
18  the law or factual conditions warrant the modification and that the proposed
19  modification is suitably tailored to the changed circumstances.
20         120.   The Parties agree to defend the provisions of this Agreement.  The
21  Parties will notify each other of any court or administrative challenge to this
22  Agreement.  In the event any provision of this Agreement is challenged in any state
23  court, removal to a federal court shall be sought by the Parties.
24         121.   The County and the Sheriff agree to promptly notify DOJ if any term
25  of this Agreement becomes the subject of collective bargaining consultation and to
26  consult with DOJ in a timely manner regarding the position the County or the
27  Sheriff takes in any collective bargaining consultation connected with this
28  Agreement.

54

1    122.   This Agreement will constitute the entire integrated agreement of the

2   Parties and will supersede the 2002 Memorandum of Agreement Between the

3   United States and Los Angeles County, California, Regarding Mental Health

4   Services at the Los Angeles County Jail ("2002 MOA").   No prior or

5   contemporaneous communications, oral or written, will be relevant or admissible

6   for purposes of determining the meaning of any provisions herein, in this litigation

7   or in any other proceeding.

8    123.   The Agreement will be applicable to, and binding upon, all Parties,

9   their officers, agents, employees, assigns, and their successors in office.

10    124.   Failure by any Party to enforce this entire Agreement or any provision

11   thereof with respect to any deadline or any other provision herein will not be

12   construed as a waiver of the Party's right to enforce other deadlines or provisions

13   of this Agreement.

14   **VII.   <u>STIPULATION PURSUANT TO THE PRISON LITIGATION</u>**

15   **<u>REFORM ACT, 18 U.S.C. § 3626</u>**

16    125.   The Parties stipulate and the Court finds, pursuant to 18 U.S.C. §

17   3626(a),  that although this matter was not actually litigated or resolved on the

18   merits, the prospective relief in this Agreement is narrowly drawn, extends no

19   further than necessary to correct the violations of federal rights as alleged by the

20   United States in its Complaint, is the least intrusive means necessary to correct

21   those alleged violations, and will not have an adverse impact on public safety or

22   the operation of a criminal justice system.  If the Court does not make the requisite

23   findings and the United States' Complaint is dismissed with prejudice, the Parties

24   agree that this Agreement will become a binding Memorandum of Agreement that

25   will supersede the 2002 MOA.  Any admission made for purposes of this

26   Agreement is not admissible if presented by third parties in another proceeding.

27

28

Respectfully submitted this ___ day of _____, 2015.

For the UNITED STATES OF AMERICA:

LORETTA E. LYNCH
Attorney General

EILEEN M. DECKER
United States Attorney

MARK KAPPELHOFF
Acting Deputy Assistant Attorney
General

LEON W. WEIDMAN
Assistant United States Attorney
Chief, Civil Division

ROBYN-MARIE LYON MONTELEONE
Assistant United States Attorney
Assistant Division Chief
Civil Rights Unit Chief, Civil Division

JUDITH C. PRESTON
Acting Chief

JOANNA HULL
Assistant United States Attorney
    U.S. Attorney's Office for the
    Central District of California
300 North Los Angeles Street, Suite 7516
Los Angeles, California 90012

LAURA L. COON
Special Counsel
LUIS E. SAUCEDO
CATHLEEN S. TRAINOR
Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, NW
    PHB 5026
Washington, D.C.  20530

56

1  For the COUNTY OF LOS ANGELES and the LOS ANGELES COUNTY

2  SHERIFF, in his official capacity:

3

4                                    _____

5                                    JIM MCDONNELL
                                     Sheriff

6

7                                    _____

8                                    MARY C. WICKHAM
                                     Interim County Counsel

9                                    County of Los Angeles

10                                   _____

11                                   RODRIGO A. CASTRO-SILVA
                                     Senior Assistant County Counsel

12                                   County of Los Angeles

13

14

15  IT SO ORDERED

16

17  DATED: September 03, 2015

18

19                                   _____

20                                   UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28

                                    57